IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| A.J. and R.J., minor children, by | ) | |
| Rahul Julka, their father and next friend, | ) | |
| RAHUL JULKA, and KOMAL JULKA, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | Case No. 17 C 2849 |
| | ) | |
| BOARD OF EDUCATION FOR BUTLER | ) | |
| ILLINOIS SCHOOL DISTRICT #53, | ) | |
| HEIDI WENNSTROM, KELLY VOLIVA, | ) | |
| and ALAN HANZLIK, | ) | |
| | ) | |
| Defendants. | ) | |

## **PLAINTIFFS' MOTION AND MEMORANDUM IN SUPPORT OF A NEW TRIAL**

Plaintiffs', A.J. and R.J., minor children, by Rahul Julka, their father and next friend, Rahul Julka and Komal Julka, move this Honorable Court for a New Trial, pursuant to Federal Rules of Civil Procedure 59 and 60. In support thereof, Plaintiffs state as follows:

i

## TABLE OF CONTENTS

I.    Introduction ................................................................................................. 1

II.   Rule 59 Standard For A New Trial and Rule 60 Standard for Relief From Judgment.  1

   A.   Defendants' Changed Position Caused Unfair Surprise to Plaintiffs and Requires the Grant of  New Trial. .................................................................................. 4

   B.   The Jury's Verdicts Were Against the Manifest Weight of the Evidence. ................. 22

III.  Conclusion.................................................................................................. 24

## TABLE OF AUTHORITIES

### CASES

*ABM Marking, Inc. v. Zanasi Fratelli, S.R.L.*, 353 F.3d 541 (7th Cir. 2003)................................ 23

*Andrews v. CBOCS West, Inc.*, No. 09-cv-1025-WDS-SCW, 2011 U.S. Dist. LEXIS 17505, 2011 WL 722606 (S.D. Ill. Feb. 23, 2011) ................................................................ 15

*Antevski v. Volkswagenwerk Aktiengesellschaft*, 4 F.3d 537 (7th Cir. 1993) ................................ 4

*Barber v. City of Chi.*, 725 F.3d 702, 715 (7th Cir. 2013)............................................................ 2

*Becton Dickinson & Co. v. Tyco Healthcare Group LP*, No. 02-1694, 2006 WL 890995m(D. Del. Mar. 31, 2006) .............................................................................................. 3

*Bob Willow Motors, Inc. v. Gen. Motors Corp.*, 872 F.2d 788 (7th Cir. 1989)........................... 22

*Brandt v. Vulcan, Inc.*, 30 F. 3d 752 (7th Cir. 1994) ................................................................. 2

*Byrd v. Blue Ridge Rural Elec. Coop., Inc.*, 356 U.S. 525 (1958)................................................ 22

*Christmas v. City of Chicago*, 682 F.3d 632 (7th Cir. 2012)......................................................... 3

*Conway v. Chem. Leaman Tank Lines, Inc.*, 687 F.2d 108 (5th Cir.1982)...................................... 3

*Fast Food Gourmet, Inc. v. Little Lady Foods, Inc.*, No. 05 C 760, 2007 U.S. Dist. LEXIS 77439, 2007 WL 3052944 (N.D. Ill. Oct. 18, 2007) .............................................................. 14

*Gasperini v. Ctr. for Humanities, Inc.*, 518 U.S. 415 (1996) ...................................................... 22

*Goldman v. Checker Taxi Co.*, 325 F.2d 853 (7th Cir. 1963)...................................................... 15

*Hillard v. Hagranes*, 197 F.R.D. 358 (N.D. Ill. Feb. 4, 2000) ..................................................... 3

*Kiefel v. Las Vegas Hacienda*, 404 F.2d 1163 (7th Cir. 1969) ..................................................... 3

*Lonsdorf v. Seefeldt*, 47 F.3d 893 (7th Cir. 1995)............................................................... 4, 21

*Mejia v. Cook County., Ill.*, 650 F.3d 631 (7th Cir. 2011)........................................................... 2

*Montgomery Ward & Co. v. Duncan*, 311 U.S. 243 (1940) ....................................................... 22

*Perez-Perez v. Popular Leasing Rental, Inc.*, 993 F.2d 281 (1st Cir. 1993) ................................. 3

*Sanford v. Crittenden Mem'l Hosp.*, 141 F.3d 882 (8th Cir. 1998) ................................. 3

*Talbert v. City of Chicago*, 236 F.R.D. 415 (N.D. Ill. 2006) ........................................ 14

*Thompson v. City of Chicago,* 722 F.3d 963 (7th Cir. 2013) .................................... 2, 3

*Ty, Inc. v. Softbelly's Inc.*, 353 F.3d 528 (7th Cir. 2003) ........................................ 21

*United States v. Procter & Gamble Co.*, 356 U.S. 677 (1958) .................................... 15

*United States v. Shepard*, 576 F.2d 723 (7th Cir. 1978) ........................................ 3

*United States v. Walker*, 652 F.2d 708 (7th Cir. 1981) ........................................ 2, 3

*United States v. Washington*, 184 F.3d 653 (7th Cir. 1999) ........................................ 22

*Walden v. City of Chicago*, 846 F. Supp.2d 963 (N.D. Ill. 2012) .................................. 2

*White v. Anthology, Inc.*, 2009 WL 4215096 (N.D. Ill. Nov. 16, 2009) .......................... 4

*Wilson v. City of Chicago*, 6 F.3d 1233 (7th Cir. 1993) ........................................ 2

## RULES

Federal Rule of Civil Procedure 26(e) ........................................................... 14

Federal Rule of Civil Procedure 59(a) ........................................................... 1, 4

Federal Rule of Civil Procedure 60(b)(3), ....................................................... 4, 21

## I.      Introduction

A jury trial in the above-captioned matter commenced on December 16, 2019. Prior to the trial and per this Court's standing order, a pretrial conference was held on December 3, 2019. At said pretrial conference, both parties produced motions *in limine*, witness lists, proposed jury instructions, and proposed trial exhibits. In compliance with this Court's standing order for pretrial conferences, each party submitted their theory of the case. At this time, nor at any time prior to the pretrial conference, did Defendants ever assert a theory that the totality of Defendants' actions giving rise to this litigation, were a mistake. This defense was inappropriately asserted for the first time at trial, after over four years of extensive discovery and related litigation. In addition, Defendants, for the first time asserted that the Jain investigation justified their conduct and the sanctions imposed against the Julkas. Finally, a new trial is warranted because Defendants failed to disclose evidence required by Federal Rule of Civil Procedure 26(e). In the alternative, Plaintiffs are entitled to a new trial pursuant to Federal Rule of Civil Procedure 60(b)(3) because Defendants presented false testimony.  The cumulative effect resulted in Plaintiffs failure to receive a fair trial. Plaintiffs produced evidence that supported a verdict in their favor and the jury's ruling was against the manifest weight of the evidence. Additionally, Defendants misconduct, misrepresentations and fraud caused unfair prejudice to the Plaintiffs and warrant a new trial. Thus, for all the reasons stated below, Plaintiffs should be entitled to a new trial.

## II.      Rule 59 Standard For A New Trial and Rule 60 Standard for Relief From Judgment.

Federal Rule of Civil Procedure 59(a) provides that a new trial may be granted "for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P 59(a). Under Fed. R. Civ. P. 59, a district court has the power to grant a new trial "if the verdict was against the weight of the evidence." *Mejia v. Cook County., Ill.*, 650 F.3d 631, 633

1

(7th Cir. 2011) (collecting cases). Courts should not view the evidence in the light most favorable to the non-movant; instead, the evidence should be viewed "neutrally," and courts are free to weigh the evidence when deciding whether to grant a new trial. *Mejia*, 650 F.3d at 634. Similarly, an error concerning admitting or excluding evidence warrants a new trial when it causes prejudice to the substantial rights of a party, *i.e.*, if there is a "significant chance that the error affected the jury's verdict." *Barber v. City of Chi.*, 725 F.3d 702, 715 (7th Cir. 2013).

Importantly, a new trial is warranted based upon a party's misconduct, including, discovery violations, if the moving party "demonstrate[s] both that misconduct occurred and that it prejudiced him." *Brandt v. Vulcan, Inc.*, 30 F. 3d 752, 758 (7th Cir. 1994). As former Chief Judge Castillo aptly explained in granting a new trial in another case:

> The improper conduct tainted the trial from opening statements through closing arguments, and the Court is not confident that the sustained objections, admonishing of counsel, and jury instructions sufficiently minimized the harm that resulted from the numerous inappropriate statements, questions, and arguments that occurred throughout trial. While there is sufficient evidence that the pattern of misconduct by the City's attorneys was intentional, their repeated disregard for the Court's rulings and careless presentation of barred evidence to the jury prejudiced Walden's case and entitle him to a new trial.
>
> There must be a bright line between aggressive advocacy and "win-at-all costs" unethical conduct. This bright line has been crossed by defense counsel's repeated ill-advised actions in this case. Walden is not entitled to a perfect trial nor is he guarantee success at trial. Instead, he is entitled to a fair trial conducted within the legitimate contours of advocacy he did not receive one.

*Walden v. City of Chicago*, 846 F. Supp.2d 963, 980 (N.D. Ill. 2012).

A new trial is also fitting where a court abuses its discretion in admitting or excluding evidence, so long as the error or errors were not harmless. *See Thompson v. City of Chicago,* 722 F.3d 963, 971 (7th Cir. 2013); *see also Wilson v. City of Chicago*, 6 F.3d 1233, 1238 (7th Cir. 1993); *United States v. Walker*, 652 F.2d 708, 714 (7th Cir. 1981) ("An error is harmless only if are convinced that the error did not influence the jury, or had but very slight effect, and can say

2

with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error.") (internal formatting omitted) (citing *United States v. Shepard*, 576 F.2d 723-24 (7th Cir. 1978). "Surprise during trial, by major variance in theory of recovery or defense, undisclosed until after the trial is underway, is a long-established ground for granting a new trial motion." *Sanford v. Crittenden Mem'l Hosp.*, 141 F.3d 882, 886 (8th Cir. 1998) (granting new trial due to plaintiff's expert's mid-trial shift in testimony); *see also Perez-Perez v. Popular Leasing Rental, Inc.*, 993 F.2d 281, 286-88 (1st Cir. 1993) (granting new trial where plaintiff introduced new theory of liability not included in pretrial order); *Conway v. Chem. Leaman Tank Lines, Inc.*, 687 F.2d 108, 112 (5th Cir.1982) (new theory by expert witness introduced midtrial constituted unfair surprise justifying a new trial); *Becton Dickinson & Co. v. Tyco Healthcare Group LP*, No. 02-1694, 2006 WL 890995, at *10-12 (D. Del. Mar. 31, 2006) (granting new trial in patent case where plaintiff advanced new theory of infringement at trial).

A single erroneous ruling may justify a new trial, as may the cumulative effect of all such rulings. *See Walker*, 652 F.2d at 714; *Thompson*, 722 F.3d at 979 ("Cumulative prejudice occurs when (1) multiple errors occurred at trial; and (2) those errors, in the context of the entire trial, where so severe as to have rendered the trial fundamentally unfair.") (internal formatting omitted) (Citing *Christmas v. City of Chicago*, 682 F.3d 632, 643 (7th Cir. 2012)); *see also Kiefel v. Las Vegas Hacienda*, 404 F.2d 1163 (7th Cir. 1969) (upholding district court grant of a new trial based on cumulative errors and awarding sanctions against party who vexatiously multiplied the proceedings); *Hillard v. Hagranes*, 197 F.R.D. 358, 361 (N.D. Ill. Feb. 4, 2000).

The Seventh Circuit has said that "[i]f a verdict is based on false testimony, the district judge has the discretion under Rule 59 to grant the injured party a new trial." *Antevski v.*

3

*Volkswagenwerk Aktiengesellschaft*, 4 F.3d 537, 540 (7th Cir. 1993). False testimony also can be considered a form of "fraud" under Rule 60(b)(3), and courts have noted that there is no substantive difference in the standard for assessing a motion for new trial based on introduction of false testimony under Rules 59(a) and 60(b)(3). See *White v. Anthology, Inc.*, 2009 WL 4215096, at *2 (N.D. Ill. Nov. 16, 2009). As such, to succeed on this argument under either Rule 59(a) or 60(b)(3), Plaintiffs must show that they maintained a meritorious claim at trial and that because of Defendants' fraud or misrepresentation— in this case, the presentation of false testimony—they were prevented from fully and fairly presenting that claim. *See Lonsdorf v. Seefeldt*, 47 F.3d 893, 897 (7th Cir. 1995).

### A. Defendants' Changed Position Caused Unfair Surprise to Plaintiffs and Requires the Grant of New Trial.

At trial, for the first time, Defendants took the position that the February 8th sanction letter, issued to the Julka family, contained a "typographical error," and for the first time, argued that the Julka boys did not engage in academic dishonesty or cheating. As will be discussed in detail below, Defendants' position prior to trial always was that the boys engaged in academic dishonesty and therefore the February 8th and April 15th letters were proper disciplinary records and made no mention of a typo.

Dr. Wennstrom, at trial, testified for hours the morning of December 17, 2019 during questioning by Plaintiffs' counsel. During that time, there was significant discussion pertaining to certain language contained in her February 8th letter, but she made no mention of a typographical error. Specifically, Plaintiffs' attorney asked Dr. Wennstrom to read the section of the February 8th letter containing "and your children" during her direct examination, yet she made no mention of it being a mistake or a typographical error. *See* Trial Tr. Vol 2-A, at 93-94. However, after the lunch break and following a leading question by opposing counsel, she, for the first time, stated

that that language was a typographical error. *Id.* at Vol. 2-B, at 74.

Defendants argued that Dr. Wennstrom's typo pertained to her finding that the Julka children engaged in academic dishonesty and cheating and that she erroneously included "and your children" in that letter. At trial, Dr. Wennstrom testified that there were two families who received a letter, the Jain-Goel family and the Julka family, and those letters were largely the same in content. Trial Tr. Vol. 2-B, at 75:9-16. She further testified "[a]nd the words 'and your children' were supposed to be in the Jain-Geol letter, not in the Julka letter. . ." *Id.* Dr. Wennstrom stated that she did not catch the error in the letter to the Julka family when she originally drafted it, with the assistance of legal counsel, and that she felt "terrible" about it. Trial Tr. Vol 2-B, at 75-76. Dr. Wennstrom explained that when Ms. Libbey Massey "did her review, she found that those words needed to come out and that letter needed to be replaced with those. . ." Trial Tr. Vol. 2-B, at 75. Dr. Wennstrom's false testimony at trial is completely contradictory to the testimony and position she maintained prior to trial.

Dr. Wennstrom's position, prior to trial, was that the boys engaged in academic dishonesty and cheated. In a June 15, 2016 email sent to the entire school district, she stated, "[t]his detailed investigation ultimately resulted in the Board of Education unanimously affirmed the findings and sanctions previously issued to both families." *See* Exhibit 1, attached hereto, identified as Plaintiffs' Exhibit 112 at trial. At the time that she sent this email, Ms. Massey's investigation had concluded.

**Defendants' Answer to Plaintiffs' Amended Complaint**

Plaintiffs' Amended Complaint alleged that R.J. was interviewed on February 2, 2016 regarding the Geo Bee, during which he did not implicate either himself or A.J. in any wrongdoing, cheating, or academic dishonesty. Dkt # 93, ¶ ¶ 50, 51. Defendants denied that an interrogation occurred and denied that R.J. did not implicate himself or A.J. in any wrongdoing, cheating or

academic dishonesty. *Id*. at ¶ 51. Clearly, at the onset of this litigation, Defendants took the position that the Julka children committed some type of academic dishonesty and cheating. In their Answer, Defendants admitted that Plaintiffs accurately quoted a portion of Defendant Wennstrom's February 8th letter, wherein she stated, "[t]he academic dishonesty and cheating which you and your children engaged put all of the District students. . ." *Id*. at  ¶ 54.

Further, Defendants denied that a portion of the February 8, 2016 letter, issued to the entire school district, stated that severe restrictions were placed on those who engaged in academic dishonesty practices. *Id*. at ¶ 57. Defendants also denied that the April 15, 2016 decision, issued as a result of the grievance complaint, found that the February 8 letter improperly stated that R.J. and A.J. had engaged in academic dishonesty. *Id*. at ¶ 74.

In their Answer, Defendants denied engaging in extreme and outrageous conduct.  *Id*. at ¶ 104. Defendants denied that they improperly sanctioned R.J. and A.J; denied that they attempted to convince Plaintiffs that they should leave the School District; denied that they violated R.J. and A.J.'s constitutional rights; denied retaliating against R.J.; denied concealing and/or destroying evidence; denied improperly interrogating R.J.; denied that negative documents were improperly inserted in R.J.'s student record file; denied making certain findings which were completely erroneous and without merit; denied that they made the community believe that the Plaintiffs engaged in academic misconduct; and defamed the Plaintiffs. *Id*. at ¶ 151. Defendants' denial is completely at odds with their position at trial as is evident by the following line of questioning by defense counsel to Defendant Wennstrom:

> Q:    So when you originally drafted the letter with the assistance of your legal counsel, you did not catch the error in the letter to the Julka family which stated that the parents and their children had engaged in academic dishonesty?

> A:    ... Yeah, that is correct.

6

Q:      ... That was an error?

A:      ... That was an error and it should not have happened.

Q:      ... Do you regret that, Dr. Wennstrom?

A:      ...Actually I feel terrible about that. And I was thankful it was caught and
we were eager to replace that."

Trial Tr. Vol. 2-B, at 75.

**Defendants' Position at Summary Judgment**

Defendants maintained, in their Local Rule 56.1 Separate Statement of Undisputed

Material Facts, as an undisputed material fact, that Dr. Wennstrom concluded that the Julkas

engaged in academic dishonesty and issued two sanctions. *See* Docket Number (hereinafter "Dkt

#") 159, at ¶ 33. It is evident that Defendants' position, prior to trial, was that the February 8th

letter properly documented the School's belief that the Julka boys engaged in academic dishonesty

and cheating. At trial, Defendants took the opposite position and consistently elicited testimony

from their witnesses that Dr. Wennstrom's February 8th letter mistakenly found that the Julka

children engaged in academic dishonesty and cheating.

In their Memorandum in Support of Motion for Summary Judgment, Defendants argued

that the February 2016 letter was accurate and contained no mistakes. *See* Dkt # 158, p. 12.

Additionally, Defendants argued in their memorandum that the February 2016 letter related to a

disciplinary issue concerning the children and therefore Defendants followed Illinois law on

retention of disciplinary records. *See* Dkt # 158, p. 7. This is the position that Defendants took

during a student records hearing, in which the Julkas challenged that the February 8th letter should

not be included in their children's student records.

**Defendants' Position at Student Record Hearing**

During that hearing, which took place on August 30, 2016, Caroline Rosselli, the School

7

District's attorney, who also testified at trial, made no mention of a "typo" in the February 8th letter. Instead, she argued that the inclusion of the letters in the student records was proper because "but for such an inclusion the restrictions related to school-sponsored activities would not be clearly communicated to future administrators." *See* Dkt # 244, p. 95. Further, during that hearing, Defendant Hanzlik testified that the findings contained in the April 15, 2016 letter "absolutely pertained" to the Julka children and Julka family. *Id*. at 99. In that April letter, Hanzlik wrote ". . . so long as there are no future incidents of academic dishonesty by you or your children. . . the Board of Education is open to considering removal of the February 8th, 2016 letter and this letter of April 15, 2016 from your children's student record files. . ." *See* Exhibit 2, attached hereto, identified as Plaintiffs' Trial Exhibit 107. Furthermore, Hanzlik also testified that the School Board affirmed all findings of Dr. Wennstrom, including the finding contained in paragraph 8, that the Julkas and their children engaged in academic dishonesty and cheating. *See* Dkt. 244, p. at 102.

Dr. Wennstrom, during that hearing, defended her February 8th letter and the findings contained therein, specifically with respect to misconduct by the Julka children. Wennstrom represented that her February 8th letter "was the conclusion and the findings and the restrictions based on our internal investigation, that internal investigation lasted approximately 5 weeks." *Id*. at 130. Specifically, Dr. Wennstrom testified that the findings in her February 8th letter were against the ***children*** and parents. *Id*. at 111 (*emphasis added)*. Wennstrom testified that the findings were against the Julka boys and parents because "there [was] no way to look at 1 through 10 and say that a parent's actions are separate from a child's actions. . ." *Id*. at 114. She further testified that she "did not feel that the children's actions could be viewed as separate from the parents' because the children could not opt out of cheating." *Id*. at 120. She testified to the specific findings of disciplinary actions she referenced in her February 8th letter. She testified that finding number

8

1, specifically, pertained to conduct by the children because they refer to intended actions by the family pertaining to the children. *Id*. at 111-12. She also stated that finding number 7, specifically pertained to the children and that the Julka children were legally responsible for the actions of their parents. *Id*. at 112, 114. Defendant Wennstrom made no mention of a typo in her February 8th letter and explained why she included the "and your children" language. *Id*. at 131-32.

Moreover, Defendant Wennstrom testified that the February 8th letter that concluded the Julka boys engaged in academic dishonesty and cheating was properly maintained in their student files because it constituted a letter that pertained "to the educational process or programing as it relates to children" *Id*. at 132. She further testified that the February 8th letter contained student information that was specific to A.J. and R.J. because of the "and your children" language. *Id*. at 131. Based on the "and your children language," Defendant Wennstrom testified that the letters constituted student records and were properly maintained in the boys' student files. *Id*. 133-35. Wennstrom testified that the student file is the only possible place for the School to keep a letter like the February 8th one and she felt that was in accordance with the requirements that they have for maintaining information. *Id*. at 133.

During this hearing, Wennstrom was asked specifically whether her February 8th letter referenced any school policy that both Julka children violated. *Id*. at 128. Wennstrom responded "[t]he policy number that was stated we did use this policy in writing that letter, item 8 on Page 2; Item 2 on Page 3 were reviewed as the most appropriate for the determination made in the February 8th letter." *Id*. at 128. She also testified that the context for the restrictions in the Julka matter were essential because it was an unusual case. *Id*. at 135. Dr. Wennstrom's testimony was clear that the language pertaining to the Julka children in her February 8th letter was correct and accurately documented a disciplinary issue requiring insertion to the children's student records. This position

9

was opposite to the position she took at trial.

In her deposition, Dr. Wennstrom stated that the "and your children" language was removed as a result of the uniform grievance and Ms. Massey's investigation. *See* Dkt # 164, p. 66. She further explained that after the Libbey Massey investigation, they were required to remove the words, "and your children." *See* Dkt# 164, p. 67. Dr. Wennstrom then explained the reason why the words "and your children" were removed: "[t]he reason that those words were removed is because—they were only removed in your letter, not in the letter for the other family, and that's because [R.J.] and [A.J.] did not participate that day, but that does not mean that there was not a pervasive attempt to cheat." *See* Dkt # 164, p. 67. She made no mention of a typo in her 354 page deposition. *See, Id.*

In May of 2016, Rahul Julka filed a complaint for judicial review on behalf of A.J. and R.J. It is important to note that Rahul and Komal Julka were not named parties in that matter and it strictly pertained to the Julka children. In that complaint, Plaintiffs, A.J. and R.J., challenged the School Board's ruling dated April 15, 2016, sustaining the findings in paragraph 8 of Wennstrom's February 8 letter relating to allegations of wrongdoing, cheating, and academic dishonesty by A.J. and R.J. Simply put, A.J. and R.J. alleged that they were improperly identified as engaging in academic dishonesty and cheating.

Newspaper articles also prove that Defendants' position prior to trial was that the Julka boys engaged in academic dishonesty and cheating; and that the February 8th letter properly included the "and your children" language. In a July 11, 2018 Daily Herald article, Wennstrom responded to the allegations made in the children's complaint challenging the determination that they engaged in academic dishonesty and cheating. She characterized the complaint as frivolous, groundless and unwarranted and made no mention that the February 8th letter contained a typo.

*See* Exhibit 3, attached hereto, identified as Plaintiffs' Trial Exhibit 129.

Email correspondence dated June 16, 2016, revealed that a media consultant for Defendants advised that it put out a written statement to "rebut any falsehoods and provide rationale for the District's sanctions" after being contacted by a report from the Chicago Tribune. *See* Exhibit 4, attached hereto, identified as Plaintiffs' Trial Exhibit 77. Nowhere does anyone acknowledge a mistake concerning the findings that the children and Rahul engaged in academic dishonesty and cheating. In addition, Defendant Hanzlik, in an article dated June 16, 2016 from the Daily Herald, was quoted stating: "[w]e have conclusive proof that there was intent to cheat by the parents and that children were prepped with that material. Not once have these families acknowledged their wrongdoing or apologized for making a mistake. So we can't jeopardize the reputation of the school and the district by allowing them to participate in those kinds of contests."*See* Dkt. 189-2, p 5.

### Defendant Hanzlik's Deposition

Defendant Hanzlik's statements in the Daily Herald article were echoed during his deposition. During his deposition, Hanzlik testified that he believed that the Julkas had an actual copy of the 2016 exam. *See* Dkt. 168, at p. 52. Hanzlik could not say for sure whether the Julka children ever heard any of the questions from the test materials, but believed everything Dr. Wennstrom found during her investigation. *Id.* at pp. 54, 55, 61. Hanzlik was asked when Dr. Wennstrom originally issued the sanctions on February 8th of 2016, if it was his understanding, at that time, that the Julka boys had not done anything wrong. In response, Hanzlik testified, "[a]t that time, it was my understanding that we needed to do something to make sure this didn't happen again. We sent -- in this case -- the family a correct message that academic dishonesty would not be tolerated." *Id.* at p. 82. Hanzlik was asked whether the modification to the February 8th, 2016 and April 15th, 2016 letters where the 'and the children' was stricken out, was a result of any state

litigation. *Id*. at pp. at 173-74. Hanzlik responded that he was aware of the state litigation and that "[t]here was virtually every avenue pursued by the Julka family that was available. ... But do you know whether the striking out of that language, referring to the students, was the result of any state court litigation or not? ... I don't remember." *Id*. at pp 173-74.

### **New Trial is Warranted Pursuant to Rules 59 and 60**

In these circumstances, a new trial is warranted. Plaintiffs were unfairly prejudiced and surprised at trial by Defendants' abrupt and unheralded change in factual sworn testimony in significant and material respects and change in their theory of the case. Defendants, at the eleventh hour, mid-trial, and without any notice, decided to defend their actions based on the conduct of another student who did cheat and used that as a justification for the sanctions imposed. Defendants presented new factual theories at trial that Plaintiffs never had been afforded the opportunity to test or challenge through discovery.

The Defendants' last-minute defense that the accusatory language attributed to the Julka children was a "typo" stood in stark contrast to their position for the nearly four years leading up to the trial. Plaintiffs were required to prove that the Defendants intentionally published false information about them and included the false allegations into the student record. If the jury believed that the accusatory language concerning the children was in fact a "typo" they could not conclude that the Defendants' actions were intentional and/or outrageous. The "typo" defense was falsely asserted during the trial in a last-ditch effort to save their case.

Prior to the "typo" defense being raised, the evidence showed that the Julka boys, as well as the father, did nothing wrong but were nonetheless falsely accused. The evidence showed that the February 8, 2016 letters clearly alleged that the entire family engaged in academic dishonesty. Wennstrom recognized this. Roselli recognized this. Hence, the sudden change. Plaintiffs lost all credibility with the jury at this point considering it promised them that the evidence would prove

12

intentional misconduct on the part of the Defendants. Had this sham defense been raised when it was supposed to have been, Plaintiffs would have had the opportunity to challenge this during the discovery process. Defendants' conduct was manifestly unfair and inconsistent with both the letter and spirit of discovery and is incompatible with the truth-seeking function of trial requiring a new trial.

### Defendants' New Theory That the Jain Investigation Justified Its Actions

As the trial progressed and the evidence came in, the Defendants recognized that it was becoming very clear to the jury that the decision to portray the Julkas as cheaters to the entire community was not appropriate. The evidence established, at best, that Ms. Julka *attempted* to cheat but withdrew her children from the competition. Clearly the Defendants recognized that their charges directed at an entire family were improper based upon an *attempt* to cheat at something as trivial as a "spelling bee." Accordingly, the Defendants changed theories mid trial.

After almost four years of the Defendants claiming that the Julkas' misconduct was of such importance that it required the severe penalty, the Defendants suddenly maintained that the fact that the Jain child actually competed in the contest was the most compelling reason to justify the harsh sanctions. Plaintiffs were essentially forced to litigate the Jain case. What is more, Plaintiffs had to fight this battle without any documents concerning the Jain case. The Defendants prevented Plaintiffs from using anything related to the Jain case as demonstrated by their motion *in limine*. More important, Plaintiffs had no reason to believe that Defendants would change their theory during the trial by using the actions of the Jain case as a fresh defense to justify their acts taken against the Julkas.

Prior to trial, Defendants submitted a motion in *limine* seeking to bar the use or any testimony related to the privilege log from case number 17-cv-0002, *S. Jain v. Butler Illinois School District 53, et al*, on relevance grounds. *See* Dkt# 232, p. 8-9. At the pretrial conference,

13

Defense counsel further argued that testimony about the privilege log produced in the Jain case was irrelevant because it was "a different lawsuit under circumstances that, you know, no one here would be competent to talk about. . ." Pretrial Transcript, at 26. Despite this, at trial, Defendants' made the Jain case relevant.

### Defendants Failed to Disclose Evidence Required by Federal Rule of Civil Procedure 26(e) and Provided False Testimony

At trial, Defendants presented, for the first time, a one-page document that they purported to be from Defendant Voliva's day-planner listing her schedule for June 3, 2015. *See* Exhibit 5, attached hereto, identified as Defendants' Exhibit 165 at Trial. Defendants argued that this document proved that Defendant Voliva met with the Julkas in regard to the 2015 cheating incident. Federal Rule of Civil Procedure 26(e) requires that "[a] party who has made a disclosure under Rule 26(a) - or who has responded to an interrogatory request for production, or request for admission – must supplement or correct its disclosure in response: . . . if the party learns that in some material respect the disclosure or response is incomplete or correct, and if the additional or corrective information had not otherwise been made known to the other parties during the discovery process or in writing." Discovery in this matter closed on October 19, 2018, yet the Document in question, according to the Defendants was created in 2015.

The purpose of Rule 26(a)(1) "is to accelerate the exchange of basic information about the case and to eliminate the paperwork involved in requesting such information." FED. R. CIV. P. 26(a) advisory committee's note. Although Rule 26(e) allows for supplementation after the discovery cutoff, its purpose is to prevent unfair surprise at trial by ensuring that the other party has adequate notice of the new information. *See Fast Food Gourmet, Inc. v. Little Lady Foods, Inc.*, No. 05 C 760, 2007 U.S. Dist. LEXIS 77439, 2007 WL 3052944, *3 (N.D. Ill. Oct. 18, 2007); *see also Talbert v. City of Chicago*, 236 F.R.D. 415, 421 (N.D. Ill. 2006); *see also Andrews v.*

*CBOCS West, Inc.*, No. 09-cv-1025-WDS-SCW, 2011 U.S. Dist. LEXIS 17505, 2011 WL 722606, at *3 (S.D. Ill. Feb. 23, 2011); *see also Goldman v. Checker Taxi Co.*, 325 F.2d 853, 855 (7th Cir. 1963) (citing *United States v. Procter & Gamble Co.*, 356 U.S. 677, 682, 78 S. Ct. 983, 2 L. Ed. 2d 1077 (1958)) (discovery provisions in the Federal Rules intended to make "trial less a game of blindman's buff and more a fair contest with the basic issues and *facts disclosed to the fullest practicable extent*.").

Additionally, this Court's standing pretrial order rules require identification of "all exhibits a party may introduce at trial." This requirement has the purpose of, among many things, avoiding unfair surprise at trial and permitting the opposing party to make objections so that issues of admissibility can be addressed in a manner that will not disrupt the flow of the trial or unduly impose on the jury. In this case, Defendants failed to produce this document throughout the course of discovery and failed to identify this document as a potential trial exhibit. Defendants should have disclosed this document during discovery as the 2015 Blue Slip is and was a large subject of Plaintiffs' Amended Complaint, claims and a subject in depositions.

From the onset of these proceedings, Plaintiffs asserted that the school board included false documents in R.J.'s student record in retaliation for the filing of the grievance. One document was the subject of much query between the parties, the 2015 blue slip. The Julkas do not dispute that an incident with a science test occurred on the date in question; however the Julkas insisted that the blue slip was false for multiple reasons. The blue slip did not appear in R.J.'s student records pursuant to the first request made by the family in March of 2016 which asked for all disciplinary documents. Certainly, if the blue slip was prepared in June of 2015, it should have appeared in R.J.s student record pursuant to the request. The Board concluded the grievance investigation on April 15, 2016, denied the grievance in its entirety and upheld Dr. Wennstrom's findings and

sanctions. The next two records request were done after the grievance was denied. These responses included the blue slip at issue. The school argued that it was a mistake that the blue slip was not included in the first response. The Julkas argued that second page was fabricated because, among other reasons, it stated that both Julka parents and R.J. were present for a meeting with Ms. Voliva the same day that the blue slip was prepared. Another concern held by the Julkas was that the blue slip was filled out by Ms. Voliva, not the teacher who witnessed the misconduct. Moreover, the signature block for the student was left blank. Additionally, the Julkas were alarmed that page one of the blue slip appeared to have two different versions. The most significant concern was that page two referenced a parent meeting held on June 3, 2015. This dispute was raised in pleadings and was the subject of extensive written and oral discovery.

Although Plaintiffs' counsel questioned Ms. Voliva considerably throughout her deposition about the disputed meeting with the Julka parents, she at no point raised the planner in any way. *See* Exhibit 6, attached hereto at pp. 38-40. Furthermore, she recalled very limited details regarding the meeting, such as who contacted the parents or what day the meeting took place. *Id.* Principal Voliva, under sworn deposition testimony, stated that both Julka parents physically came to the school and she met with them and Plaintiff R.J. to discuss the Blue Slip incident. *Id.* at pp. 39, 40. At trial, Defendant Voliva recalled, definitively, that her meeting with the Julkas took place on June 3, 2015. *See* Trial Tr. Vol. 4-B, at 109. Defendants then introduced the one-page document from her day planner to substantiate this assertion. *See* Trial Tr. Vol. 4-B, at 109. Ms. Voliva's inconsistent testimony throughout the pre-litigation process into the trial is muddled by the testimony of Mr. Adam Nicholson at trial.

Mr. Nicholson testified that he brought the incident to Voliva's attention on June 3, 2015, while she testified at trial that the incident occurred on June 2, 2015 and that same day, she

16

scheduled the meeting for June 3, 2015. *See* Trial Tr. Vol. 4-B, at 113; Vol. 5-A, at 48. Furthermore, Nicholson stated that he did not see Dr. and Mrs. Julka on June 3, 2015, but trusted Voliva's account of a meeting occurring. *See* Trial tr. Vol. 5-A, at 63. However, Nicholson testified that he brought R.J. to Ms. Volivas' office and did not leave her office until 12:35. This makes it clear that Ms. Voliva's planner was inaccurate. No meeting occurred between Dr. and Mrs. Julka and Ms. Voliva on June 3, 2015 at 12:30. Mr. Nicholson's testimony further contradicts the statements made on the blue slip, which state that R.J. was present at the meeting and honest with his parents. Nicholson's testimony proves that Voliva gave false testimony as discussed in more detail below. Trial Tr. Vol. 5-A, at 51.

During her deposition, Ms. Voliva explained that R.J.'s missing signature on the blue slip was due to her writing it after the end of the school year and because student signatures are not required on these slips. *See* Exhibit 6, at 41. However, at trial she gave inconsistent testimony of when the blue slip was written and the reasoning as to why R.J.'s signature was not present. *See* Trial Tr. Vol. 3-A, at 65, 66, 69, 70, 71. Further, Nicholson's trial testimony contradicted Voliva's in that he testified he and Ms. Voliva prepared the blue slip together after school on June 3, 2015. *See* Trial Tr. Vol. 5-A, at 49.

The planner was a significant piece of evidence to corroborate Ms. Voliva's defense that the meeting occurred and thus was authentic. If the jury believed that the meeting did not happen it had to conclude that the document was false. What is more, based on the other suspicious factors regarding the blue slip, the jury certainly could have concluded that the blue slip was prepared and inserted into R.J.'s student record after the family had the audacity to challenge the school's determination that the family committed academic dishonesty. The school recognized that it imposed severe sanctions against the Julkas and communicated these finding to every parent,

17

student and faculty member in District 53, including those not affiliated with the Julkas' school.

The evidence showed that the school was extremely concerned about the teachers and administrators being perceived in a negative light as a result of their extreme actions against a family, who ultimately did not cheat. The insertion of a previous incident of academic dishonesty against R.J. was seen by the school as a factor to justify their outrageous behavior against the Julkas. The school was petrified that the community would consider their publicly disclosed sanctions against a family that did not cheat in something as minor as a "spelling bee" to be undeserved and unnecessary. In short, their behavior would have been seen by the jury to be so outrageous and so extreme in degree as to exceed the bounds of decency. This is precisely the language the jury was left to consider in the jury instructions during their deliberations. In conjunction with the other evidence in this case, the jury would have concluded that the falsification of the blue slip was wrongful conduct done by the school and Ms. Voliva in an effort to shield themselves from outside criticism for the issue which had become a hot topic in the community, especially after the Julka's challenged the schools actions first in the grievance.

It is important to note that Ms. Voliva's testimony concerning the calendar was after she provided damaging testimony earlier at trial. Ms. Voliva testified that she did not believe it was proper to notify the entire school district of Ms. Wennstrom's findings and sanctions. Trial Tr. Vol. 3-A, at 48-49. Her testimony on this point proved that the School and the Board improperly informed the community that the Julkas were cheaters. As a Defendant in this case, her testimony alone proved Plaintiffs' claims for intentional infliction of emotional distress. Moreover, since it is undisputed that they improperly inserted into R.J.'s student record false findings concerning allegations of academic dishonesty and cheating, the jury would have been left with no conclusion other than the school put these records in the file to protect themselves from any backlash arising

18

out of the Julkas' challenge to their authority.

Defendants had a duty to disclose the one-page document from Voliva's planner prior to trial and were required, per the Court's standing order to identify it as a potential trial exhibit. They did neither and Plaintiffs were harmed and prejudiced by the introduction of this document as an exhibit and Voliva's testimony pertaining to it. As an initial matter, throughout the pendency of this litigation, Plaintiffs maintained that this meeting never occurred and Defendants asserted that a meeting occurred, but never identified a specific date, apart from claiming the meeting took place around the end of the school year, and that both Julka parents were physically present. Had Plaintiffs been on notice of the specific date this alleged meeting took place, by virtue of disclosing the one-page document from Voliva's planner, Plaintiffs could have fronted this issue with Rahul Julka. Plaintiffs could have elicited testimony from Rahul that he never attended a meeting on June 3, 2015 pertaining to the Blue Slip and he would have corroborated that assertion based on the simple fact that he was at work.

Voliva's unequivocal testimony that this meeting occurred on June 3, 2015 with both Julka parents is false and such a meeting with Dr. Julka present was impossible because he was at work in Merrillville, Indiana. On this point, Ms. Voliva's testimony at trial cannot be reconciled with the affidavit of Jennifer Lynn Ashcroft, who affirmed that Dr. Julka was present for his work duties on June 3, 2015 in Merrillville, Indiana. *See* Dkt # 188-7. Ms. Ashcroft served as Rahul Julka's main medical assistant while he was employed at the Dalal Medical Corporation in Merrillville, Indiana. *Id*. In her affidavit, Ms. Ashcroft stated that Dr. Julka's schedule for Wednesday, June 3, 2015, between 9:00 am and 1:00 pm, included inpatient rounds/consultations, and procedures at Methodist Hospital in Gary, Indiana. *Id*. It further stated that Dr. Julka's schedule for Wednesday, June 3, 2015, between 1:00 pm and 5:00pm included outpatient office/consultations/follow-up

patient visit at 5825 Broadway, Ste #B, Merrillville, Indiana, 46410. Ms. Ashcroft concluded her affidavit by avowing that Dr. Julka was present for his work duties on June 3, 2015 at the specified times and locations indicated. *Id*. Plaintiffs presented this Affidavit in their memorandum in opposition to Defendants' motion for summary judgment. *See Id*; *See also*, Dkt # 185, p 6. In addition, Plaintiffs presented redacted medical records of Dr. Julka's patients to corroborate that Dr. Julka was working during the time this alleged meeting occurred. *See* Dkt # 188-6.

Considering the affidavit and medical records, Ms. Voliva's testimony cannot stand and her testimony is further proven false by Mr. Nicholson's trial testimony. On this point, Mr. Nicholson testified at trial as follows:

- "And when -- and where was this prepared? ... In her office. ... Had you met with Rohan at any point before this document was prepared? ... When -- in the morning that day, we went to her office to talk about it and that's when we had a conference with the student and I went back to teaching after that and then I didn't see, we didn't do this until the end of the day, until -- because I had class the afternoon. ... Okay. So you, Mrs. Voliva, and Rohan, the three of you had a conference? ... Yes." Trial Tr. Vol. 5-A, at 49:8-19.

- "What time of the morning? ... First hours of the day, somewhere between 8:50 and 10:50. ... 8:50 and 10:50. And so when you get this -- you didn't know -- strike that. When you first hear this news somewhere between 8:50 in the morning and 10:50 in the morning, you go and you speak to Ms. Voliva, correct? ... Well, first I looked at the test and I looked at the book and I tried to piece it together myself and I talked to Rohan and then went to her." Trial Tr. Vol. 5-A, at 59:18-60:2.

- "So how long would it have been after you had dropped him off approximately at the science class? ... 20 minutes. ... Okay. So 20 minutes after the class starts, you pull Rohan out, you talk to him about this incident, right? ... Yes." Trial Tr. Vol. 5-A, at 60:6-11.

- "Well, it was plan time. After I talked to him, I went back and that's when I would have talked to Ms. Voliva because he didn't seem to want to have a conversation about it." Trial Tr. Vol. 5-A, at 60:14-16.

- "And so what time do you think you talked to Mrs. Voliva about this? ... My schedule from this year is in my head. ... I get it. ... It would have been probably 9:30, 10:00 o'clock." Trial Tr. Vol. 5-A, at 60:17-21.

4843-4145-6306, v. 1

- "But if it was -- if the science class started at 10:50, then it would have been shortly after 10:50 that you would have spoken to Ms. Voliva, correct? ... Yes." Trial Tr. Vol. 5-A, at 61:8-11.

- "So it wouldn't be 8:50. It would have to be somewhere in between the earliest I guess it could be would be like 9:30, does that sound right, assuming that it started at 8:50 that day, not 10:50, the earliest that you would have talked with Rohan is about 9:30? ... I would have talked to him, yeah, about 9:30. ... Okay. So I guess using the same logic, if class -- the science test started at 10:50 that day, then the earliest you would have talked to Rohan would have been 11:30 that morning? ... Well, it wouldn't have been because I didn't have plan time at 10:30." Trial Tr. Vol. 5-A, at 61:16-62:2.

- "When you went and spoke with Ms. Voliva, did you have Rohan with you that first time? ... Yes. ... Okay. And the blue slip was -- that misconduct was discussed with Ms. Voliva and Rohan being there, correct? ... Yes." Trial Tr. Vol. 5-A, at 62:14-19.

- "So were you -- do you know -- do you know what time the parents came in? ... In the afternoon. ... Okay. It would have been sometime after I believe you said you had to go to class? ... It would have been after. ... Just let me finish if you don't mind. It would have been sometime after 12:30 when you went to class, correct? ... After 12:35, yes." Trial Tr. Vol. 5-A, at 63:4-13.

Plaintiffs have established that Voliva gave false testimony at trial along with Dr. Wennstrom and Mr. Hanzlik, as demonstrated above. In order to succeed on a Rule 60(b)(3) motion to set aside a judgment on the grounds of fraud or misconduct, "the victim of the fraud or misconduct need only show that it affected his ability to present his case, not that he would have won had the fraud or misconduct not occurred." *Ty, Inc. v. Softbelly's Inc.*, 353 F.3d 528, 536 (7th Cir. 2003)(reversed in part on other grounds, 517 F.3d 494 (7th Cir. 2008), *citing Lonsdorf v.* Seefeldt, 47 F.3d 893, 897 (7th Cir. 1995). Clearly, in addition to meeting their burden pursuant to Rule 59, Plaintiffs have also met their burden to succeed on a Rule 60(b)(3) motion to set aside judgment on grounds of fraud and misconduct. In addition, relief under Rule 60(b)(3) can include sanctions. *Id.* Plaintiffs asks the Court to award attorneys' fees and costs for the trial of this matter. Plaintiffs also asks the Court to award attorneys' fees for the bringing of this motion to set aside the judgment and the motion for a new trial.

In this motion, Plaintiffs have stopped short of alleging intentional misconduct by the attorney for the defendants. The reason is Plaintiffs don't deem it proper to make such a serious accusation without sufficient proof, notwithstanding the fact that defense counsel alleged that counsel for Plaintiffs acted in bad faith at one point in the trial. *See* Trial Tr. Vol-3A, at pp 58-59The court quickly and definitively rejected defense counsel's baseless accusation. Trial Tr. Vol-3A, at 58-59. Certainly additional discovery may determine this issue and plaintiff will defer to the court on this matter to determine if it is necessary.

**B. The Jury's Verdicts Were Against the Manifest Weight of the Evidence.**

Finally, the jury's verdicts were against the manifest weight of the evidence. The Supreme Court has long recognized that a district court can grant a motion for a new trial if the verdict was against the weight of the evidence. *Gasperini v. Ctr. for Humanities, Inc.*, 518 U.S. 415, 433 (1996); *Byrd v. Blue Ridge Rural Elec. Coop., Inc.*, 356 U.S. 525, 540 (1958); *Montgomery Ward & Co. v. Duncan*, 311 U.S. 243, 251 (1940). In considering whether a new trial is warranted, the district court has the power to get a general sense of the weight of the evidence, assessing the credibility of the witnesses and the comparative strength of the facts put forth at trial. *See, e.g., Byrd*, 356 U.S. at 540 ("The trial judge in the federal system has powers denied to the judges of many States to comment on the weight of evidence and credibility of witnesses...."); *United States v. Washington*, 184 F.3d 653, 658 (7th Cir. 1999) ("In considering the weight of the evidence, the court must necessarily consider the credibility of the witnesses."); *Bob Willow Motors, Inc. v. Gen. Motors Corp.*, 872 F.2d 788, 798 (7th Cir. 1989) ("In ruling on a motion for a new trial, the judge may consider the credibility of witnesses, the weight of the evidence, and anything else which justice requires."). If, after evaluating the evidence, the district court is of the opinion that the verdict is against the manifest weight of the evidence, like it is in this case,

22

a new trial is appropriate. *ABM Marking, Inc. v. Zanasi Fratelli, S.R.L.*, 353 F.3d 541, 544 (7th Cir. 2003).

The evidence presented at trial in Plaintiffs favor was overwhelming in this case. With respect to Count I, Plaintiffs presented substantial and uncontroverted evidence that Defendant School Board placed disciplinary records and other negative materials in R.J.'s student records. Plaintiffs' also presented uncontroverted evidence that the grievance filed on behalf of R.J. was a reason why the School Board placed the disciplinary records and other negative materials in R.J.'s student record. Plaintiffs presented direct evidence of the School Board's retaliatory motive. Lastly, Plaintiffs presented direct evidence that the Board's conduct would deter an ordinary person in R.J.'s circumstances from engaging in similar speech. In viewing the evidence, even in the light most favorable to Defendants, the jury's verdict on Count I was against the manifest weight of the evidence presented at trial.

To succeed on their claim for intentional infliction of emotional distress (hereinafter "IIED"), Plaintiffs had the burden of establishing by a preponderance of the evidence that: (1) the defendant's conduct was so outrageous in character, and so extreme in degree, as to exceed the bounds of decency; (2) the defendant intended to inflict emotional distress on the plaintiff or knew there was a high probability that his or her conduct would inflict emotional distress on plaintiff; (3) the defendant's conduct caused the plaintiff emotional distress so severe that no reasonable person could be expected to endure it. This does not require the Plaintiff to have sought or received medical treatment. *See* Dkt # 267, p. 11. Plaintiffs presented overwhelming evidence in their favor on the remaining IIED claims against all Defendants.

Plaintiffs presented substantial and uncontroverted evidence that the Defendants engaged in various forms of extreme and outrageous conduct and intended to inflict emotional distress and

23

knew that there was a high probability that such conduct would inflict emotional distress on Plaintiffs. This conduct ranges from engaging in a campaign of retaliatory acts for filing a grievance, imposing unjust sanctions against the Julka children, publicizing the Julkas' purported dishonesty, to referring to R.J. as "the boy who cried wolf." Defendants were aware of A.J. and R.J.'s young age and knew that their age made them more susceptible to emotional distress. Defendants knew the importance of academic success to A.J. and R.J. Testimony at trial revealed that the School is largely competitive and consists of students who excel academically. Further testimony revealed that academic competitions are very important to the students who attend Butler, including A.J. and R.J.

Plaintiffs established by overwhelming and uncontradicted evidence that as a result of Defendants conduct A.J. and R.J.: (1) suffered a negative impact on their reputation; (2) were called and believed to be cheaters; (3) were harassed at school by other students; (4) believed to have engaged in academic misconduct despite any evidence supporting the same; (5) and were prohibited from advancing their educational opportunities at school. The minor children were ostracized because of the allegations of cheating levied against them. They lost friends. A.J. and R.J. suffered, and continue to suffer from gastrointestinal issues. On this basis alone, Plaintiffs are entitled to a new trial.

## III.    Conclusion

WHEREFORE, for the reasons set forth herein above, Plaintiffs respectfully request that this Court grant their request for a New Trial pursuant to Rule 59, or in the alternative, Rule 60, and for any other relief that this Court deems proper.

24

Dated: January 22, 2020

Respectfully Submitted,

By:     s/Daniel Q. Herbert
Attorney for Plaintiffs

Daniel Q. Herbert, ARDC #6273940
The Herbert Law Firm
206 S. Jefferson St., Suite 100
Chicago, Illinois 60661
(312) 655-7660
Dan.herbert@danherbertlaw.com

## CERTIFICATE OF SERVICE

I hereby certify that on January 22, 2020, the foregoing document was filed with the Clerk of the Court using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

*/s/ Daniel Q. Herbert*